## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBERT A JONES,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **J. BRETT BLANTON, ARCHITECT OF THE CAPITOL,** | ) |
| **United States Capitol Building** | ) |
| **Washington, DC 20515,** | ) |
| | ) |
| Serve: | ) ) **Case No. 21-990** |
| | ) |
| **J. Brett Blanton, Architect of the Capitol,** | ) |
| **US Capitol Building** | ) |
| **Washington, DC 20515,** | ) |
| | ) |
| **United States Attorney's Office** | ) |
| **for the District of Columbia,** | ) |
| **Attn: Civil Process Clerk** | ) |
| **555 4th St., NW** | ) |
| **Washington, DC 20530,** | ) |
| | ) |
| **Merrick B. Garland, Attorney General,** | ) |
| **950 Pennsylvania Avenue, NW** | ) |
| **Washington, DC 20530-0001,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## CIVIL COMPLAINT FOR EQUITABLE AND
## <u>MONETARY RELIEF AND DEMAND FOR JURY TRIAL</u>

Plaintiff Robert A. Jones brings this complaint against Defendant J. Brett Blanton,

Architect of the Capitol ("the AOC"), for violating Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq*. ("Title VII"), the Family Medical Leave Act of 1993, 29 U.S.C. 2601, *et*

*seq*. ("FMLA"), and the Families First Coronavirus Response Act ("FFCRA"), P.L 116–127, as

amended through P.L. 116–159, enacted October 1, 2020, as applied to the agency by the Congressional Accountability Act of 1995 ("CAA"), when it terminated Jones.

## PARTIES

1.      Plaintiff Robert Jones is domiciled in Charles County, Maryland and was employed by the AOC as a Team Lead Plumber.

2.      Jones is an "employee" as defined by 42 U.S.C. § 2000e (Title VII), 29 U.S.C. § 2611 (FMLA), and P.L. § 5110(1)(C) (FFCRA) and a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F).

3.      Defendant J. Brett Blanton, Architect of the Capitol, is the federal official overseeing the agency responsible for the maintenance, operation, development, and preservation of the United States Capitol Complex, with its headquarters located at SB-15 U.S. Capitol, U.S. Capitol Building, Washington, DC 20515.

4.      The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII), 29 U.S.C. § 2611 (FMLA), P.L. § 5110(2)(A)(III) (FFCRA) and an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically Title VII.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the Defendants' headquarters are in this judicial district and the alleged violations took place in this judicial district.

## FACTUAL ALLEGATIONS

**Jones begins working for the AOC.**

9.      Jones is a 55-year-old African American male residing in Waldorf, Maryland.

2

10.    In or about 2003, the AOC hired Jones as a journeyman plumber. Jones was a term employee, meaning that his contract renewed every 13 months.

11.    When a contract expires at the end of an employee's term, the supervisors decide which employees to renew based on work performance and funding.

12.    Once the supervisors make a decision on whose contract to renew, the supervisors then inform the operations manager of their decisions on whose contracts to renew or not renew, and the operations manager signs the contracts to be renewed and supervisors inform the employees who contracts will not be renewed. From in or about 2003 to 2019, Jones's contract was renewed.

13.    Ron Riley, who is white and currently an operations manager for the AOC, was a carpenter working for the AOC before Jones began with the AOC in or about 2003.

14.    From the beginning of Jones's employment with the AOC, the AOC segregated its plumbing employees by race.

15.    Out of approximately 14 plumbers, 7 were black and 7 were white.

16.    The head supervisors when Jones began in 2003 was Mike Hotchkiss, who was white, and Kevin Ross, who was black.

17.    Hotchkiss supervised the white plumbers, while Ross supervised the black plumbers. The two teams were then referred to as "Kevin's guys" or "Mike's guys".

18.    While "Mike's guys" received the option for overtime work, "Kevin's guys" did not.

19.    While "Mike's guys" were permitted to walk off projects, "Kevin's guys" were not.

20.    In or about 2007, the AOC promoted Jones to Team Lead Plumber.

3

21.     Jones received outstanding safety awards from the AOC in 2007, 2015, 2016, 2017, and 2019, and he received performance awards from the AOC in 2004, 2007, 2010, 2011, and 2012.

**Jones is a witness for a Black coworker.**

22.     Jones experienced several interactions with Riley when Riley acted inappropriately towards Jones.

23.     In or around 2013, Riley discovered several white electricians sleeping on the job.

24.     Riley saw Jones shortly after, and approached Jones aggressively, poking Jones in the chest and saying, "I'm tired of the bullshit." While there were several employees who saw this interaction, they turned their heads as if they did not see Riley poke Jones in the chest.

25.     Jones discussed Riley poking him in the chest with his supervisor, Ross, but Jones decided not to file a complaint against Riley because Jones feared retaliation from Riley.

26.     In or around 2014, Courtney Rhodes (black), informed Jones about several interactions that Rhodes had with another AOC employee Joe Lemon (white). Lemon was harassing Rhodes and calling him racial slurs.

27.     Jones advised Rhodes to report Lemon, but before Rhodes could file a complaint, Lemon falsely accused Rhodes of threatening him to Lemon's supervisor.

28.     Because of the report, the US Capitol Police arrested Rhodes and the AOC fired Rhodes.

29.     Lemon proceeded with filing a complaint against Rhodes in the District of Columbia. In or around 2015, Jones, as well as two other black AOC employees, Ronnell James and Curtis Harris, appeared in court to testify as witnesses on behalf of Rhodes.

30.     The judge in the case dismissed the complaint against Rhodes. Based on information and belief, Lemon was frustrated with Jones, James, and Harris for being character witnesses.

31.     After the matter was dismissed, Riley had a meeting with Ross, Jones, James, and Harris, and Riley informed Ross, Jones, James, and Harris that Riley was being pressured by someone related to the case to terminate Jones, James, and Harris.

32.     During the meeting, Riley held up his hands and said, "You weigh my options 3 or 250. Do you see my dilemma?"

33.     Jones asked Riley "what about the truth," but Riley said it did not matter at that point. Jones told Riley that if he were terminated, he would get a lawyer.

34.     Soon after the meeting with Riley, Ross, Jones, James, and Harris discussing their support of Rhodes, James and Harris were terminated.

**Jones takes FMLA leave.**

35.     In or about 2017, Jones's wife was diagnosed with breast cancer. Jones submitted FMLA paperwork, allowing him to take Fridays and Mondays off to travel to Chicago with his wife for her treatment.

36.     Though the information for his FMLA leave remained the same, one of Jones's supervisors at the time, James Fuller (black), continually asked Jones for additional information, such as the name of Jones's wife's doctor, the doctor's phone number and address, and the location of the treatment.

37.     Jones's wife is a breast cancer survivor, but, as of the filing of this complaint, she still requires monthly treatment.

**Riley sets Jones up for failure on projects.**

38.     In or around mid-2017, Riley hired Jason Majors (black) as a new plumbing supervisor.

39.     Majors acted to set Jones up for failure on projects. For example, on a project Jones was assigned at the Dirksen Senate Office Building, Majors instructed Jones to cut a certain water line, telling Jones that the line was not live. Jones inspected the line and discovered it was live, and if Jones had cut it the building would have flooded.

40.     In a different instance at the Hart Senate Office Building, Majors instructed Jones to hang pipe hangers in a particular way. When Jones followed Majors' instructions, Jones was chastised for improperly hanging the pipe hangers.

41.     In or around mid-2018, Majors approached Jones, apologizing to Jones for his treatment and hostility. Majors admitted to Jones that Riley had ordered Majors to harass Jones and find any reason to terminate Jones.

42.     Majors acknowledged Jones's talent for his work and tried to pay Jones $60 as an apology. Jones told Majors to buy the plumbing team pizza instead, and Majors was terminated two months later.

43.     In or around 2018 or 2019, Jones was assigned to work on a project at the Thomas P. O'Neill Jr. Federal Building daycare. Kenny Miller, an AOC electrician, informed Jones that Miller overheard a conversation between Riley and some other AOC employees, and Miller told Jones "they were setting you up for failure."

44.     In or about January of 2019, Jones was assigned to a project working on the Russell Senate Office Building sprinkler system.

45. Fuller did not provide Jones with information that Jones needed to complete the job, giving Jones inaccurate blueprints, forcing Jones to inspect areas, taking longer to complete the job than necessary.

**Jones is treated differently than white plumbers.**

46. Jones also faced stricter scrutiny than his white coworkers.

47. In or about January of 2019, two white plumbers, Randy Buckler and Wade Garner, were unable to complete a project working on the Russell Senate Office Building patio.

48. Jones was placed on the job instead and was forced to fix numerous errors that Buckler and Garner made, and the project was delayed due to these errors. Buckler and Garner were not reprimanded but were instead assigned to other projects.

**Riley completes Jones's 2020 performance review.**

49. From in or about 2003 until 2019, Jones received all excellent performance reviews from the AOC. For example, in Jones's 2016 Performance Review, he was rated as a 5 for Accountability/Reliability and as a 5 for Technical Skills and Knowledge, and the comments noted that, "Robert is well trained in his trade and that helps him to be more efficient in his work."

50. In or about October of 2020, Jones had three primary supervisors, James Fuller, Kevin Ross, and John Zozibrag. Ross was out of the office on extended leave since March of 2020 due to COVID-19, and Zozibrag was a new manager.

51. Fuller met with Jones in October of 2020 to discuss Jones's yearly performance review. For the first time in his 18-year career with the AOC, Jones was given ratings of a 2 or a 3. When Jones asked Fuller to explain the evaluation ratings, Fuller replied, "I'm not in agreement with your evaluation, nor did I complete your evaluation."

52.     Jones said to Fuller, "My other supervisor, Kevin Ross is out on sick leave, John Zozibrag does not know anything about evaluations, that only leaves Ron Riley. Did Ron Riley complete my evaluation?" Fuller did not respond, only looking at Jones and implying that Riley did fill out Jones's evaluation. Jones asked, "How could someone who is not my direct supervisor complete my evaluation?" Again, Fuller did not respond.

**Jones contracts COVID and takes leave.**

53.     During the first week of November 2020, Jones worked in a part of the Rayburn Building with a coworker who tested positive for COVID. As a result of Jones's coworker testing positive, three carpenters and two electricians were sent home to quarantine because of close contact with the coworker.

54.     Jones reached out to Darrell Davis on the Safety team, regarding if Jones should quarantine, and Davis informed Jones that because his conversation with his coworker who tested positive did not last more than 15 minutes, Jones were not at risk.

55.     Jones emphasized to Davis that he would be working in the same room where his coworker was and that the room had not been disinfected. Jones sought further guidance from Davis, asking what protocol Jones should follow, but Davis told Jones, "There is no protocol."

56.     On or about November 17, 2020, Jones contracted COVID from working in the Cannon House Office Building, where contractors were working without masks.

57.     Jones reported the contractors who were working without masks to James Fuller, telling Fuller that Jones was currently on an inhaler using Albuterol Sulfate for treatment of Pneumonia and Bronchitis and that Jones could not afford to catch COVID. Fuller responded by telling Jones that anyone can get an inhaler.

58.     Soon after Jones's conversation with Fuller, Jones learned from watching the local NBC4 Washington news that 29 contactors at the Cannon House Office Building tested positive for COVID without the job or building being shut down.

59.     A few days after working in the Cannon House Office Building with contractors who were not wearing masks, Jones developed a sore throat and a cough.

60.     On or about November 24, 2020 was the last day that Jones reported to work at the AOC, with Jones taking annual and sick leave because of his COVID symptoms.

61.     On or about December 4, 2020, Jones tested positive for COVID.

62.     On or about December 8, 2020, Jones emailed James Fuller Jones's positive COVID test, but Fuller said he was unable to open the attachment.

63.     Also, on or about December 8, 2020, Jones sent Fuller a note from the Maryland Department of Health requiring Jones to quarantine due to his positive COVID test.

64.     On or about December 9, 2020, Jones resent the note from the Maryland Department of Health Maryland requiring Jones to quarantine to Fuller and Riley.

**Riley terminates Jones.**

65.     On or about December 9, 2020, after Jones emailed Riley notice that Jones was required to quarantine, Riley called Jones, leaving him a voicemail advising Jones that he was terminated.

66.     In the voicemail, Riley says that he knew that Jones had COVID, that Jones would receive a termination packet in the mail shortly, and that Jones's health insurance would continue for 30 days, so "you do not have to worry about that."

67.     On or about December 12, 2020, Jones called the AOC Human Resources department to request his last two SF-50s, and HR agreed to send out the paperwork to Jones.

68.     On or about December 14, 2020, Jones received a second voicemail from Riley, who called using James Fuller's phone, telling Jones not to contact HR and instead if Jones needed anything to call Riley or James directly.

69.     On or about December 21, 2020 Jones again called HR because Jones received a second doctor's note extending his quarantine. HR informed Jones that his position had been terminated, but that he was still on Administrative leave from COVID.

70.     Jones received a paycheck with an ending date of 12/19/2020 for 30 hours of Administrative Leave for the time Jones was out sick with COVID.

71.     On or about December 30, 2020, Jones learned that his health insurance benefits also ended on 12/19/2020. Jones was the only plumber terminated.

72.     As the result of AOC's illegal actions, Jones sustained mental anguish and economic damages, and he will continue to sustain damages into the future.

**COUNT I**
**Discrimination Based on Race**
**Title VII of the Civil Rights Act of 1964**
**2 U.S.C. § 1311**

73.     Jones hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

74.     Jones is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

75.     Jones is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

76.     The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

77.     The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

78.     The AOC violated Title VII, as incorporated with respect to the AOC by the

Congressional Accountability Act (CAA), by discriminating against Jones, based on his race,

when it terminated his employment on December 9, 2020.

79.     The AOC's stated reasons for terminating Jones are pretext for its unlawful race

discrimination.

80.     Jones sustained substantial monetary and non-monetary damages as the result of

the AOC's conduct.

**COUNT II**
**Family and Medical Leave Act**
**2 U.S. Code § 1312**
**Interference**

81.     Jones hereby incorporates the allegations set forth in the foregoing paragraphs as

though fully alleged herein.

82.     At all times relevant to this complaint, Jones was a "person" and an "employee"

as defined by 29 U.S.C. § 2611(2)(A).

83.     At all times relevant to this complaint, the AOC was an "employer" as defined by

29 U.S.C. § 2611(4)(A). During all relevant times, the AOC controlled the terms and conditions

of Jones's employment.

84.     Jones contracted COVID in or around November of 2020 and tested positive for

COVID on or about December 4, 2020.

85.     As a result of contracting COVID, and because Jones was under treatment for

Pneumonia and Bronchitis, his contracting COVID was a serious health condition which

required continuing treatment from a health care provider.

86.     Jones gave appropriate notice to the AOC of his need to take leave when on

December 8, 2020, Jones emailed James Fuller Jones's positive COVID test; on December 8,

2020, Jones sent Fuller a note from the Maryland Department of Health, requiring Jones to quarantine due to his positive COVID test; and on December 9, 2020, Jones resent the note from the Maryland Department of Health requiring Jones to quarantine to Fuller and Ron Riley.

87.     The AOC interfered with Jones's right to take unpaid leave when it terminated his employment on December 9, 2020.

88.     At all times relevant to this complaint, the AOC had a duty under the FMLA, 29 U.S.C. § 2615 not to interfere with Jones's rights under the FMLA.

89.     Jones sustained damages as the result of the AOC's illegal actions in violation of the FMLA.

90.     Jones is entitled to such legal or equitable relief as will effectuate the purposes of the statute, including but not limited to reinstatement, economic damages, liquidated damages, an injunction, and reasonable costs and attorneys' fees.

## COUNT III
### Family and Medical Leave Act
### 2 U.S. Code § 1312
### Retaliation

91.     Jones hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

92.     At all times relevant to this complaint, Jones was a "person" and an "employee" as defined by 29 U.S.C. § 2611(2)(A).

93.     At all times relevant to this complaint, the AOC was an "employer" as defined by 29 U.S.C. § 2611(4)(A). During all relevant times, the AOC controlled the terms and conditions of Jones's employment.

94.     Jones participated in protected activity multiple times in 2017 when he took FMLA leave to travel with his wife to Chicago for her cancer treatments.

95.     Jones additionally engaged in protected activity when he took leave in November and December of 2020 due to his contracting COVID.

96.     Jones suffered an adverse action on December 9, 2020, when Ron Riley illegally terminated Jones's employment.

97.     Jones's supervisors were aware of his taking FMLA leave in 2017 because James Fuller continually pressed Jones for additional information about Jones's leave taking.

98.     James Fuller and Ron Riley were aware of Jones's COVID diagnosis when Jones emailed Fuller and Riley a note from the Maryland Department of Health requiring Jones to quarantine on December 9, 2020.

99.     A casual connection exists between Jones's protected activity and Jones's termination, as evidence by the temporal proximity between Jones's protected activity and his termination. The same day that Jones emailed Riley Jones's quarantine note, Riley terminated Jones, and even stated on the voicemail terminating Jones that Riley knew Jones had COVID.

100.    Adverse actions were taken against Jones, in whole or in part, because he exercised his rights under the FMLA, and he engaged in protected activity.

101.    Jones sustained damages as the result of the AOC's illegal actions in violation of the FMLA, as made applicable to the AOC through the CAA.

102.    Jones is entitled to such legal or equitable relief as will effectuate the purposes of the statute, including but not limited to reinstatement, economic damages, liquidated damages, injunction, pre-judgment and post-judgment interest, and reasonable costs and attorneys' fees.

<u>COUNT IV</u>
**Families First Coronavirus Response Act**
**29 C.F.R. § 826.150**
**Retaliation**

103.    Jones hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

104.    Jones is an employee under the FFCRA.

105.    The AOC is an employer as defined by the FFCRA.

106.    By pursuing his rights under the FFCRA, and specifically the Emergency Paid Sick Leave Act ("EPSLA") to take leave due to a quarantine order from a positive COVID test, Jones engaged in protected activity under the FLSA.

107.    By terminating Jones's employment, the AOC retaliated against Jones for engaging in protected activity under the FLSA.

108.    Jones's termination constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C. § 255(a).

109.    Jones sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

**PRAYER FOR RELIEF**

Jones respectfully requests that the Court enter judgment in his favor and award to him the following relief:

a.    Reinstatement or, in lieu thereof, full front pay and benefits;

b.    Economic damages for lost compensation and benefits and damages to Jones's career, reputation, and earning capacity in an amount to be determined;

c.    Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

14

d.      Pre-judgement interest;

e.      Interest due on unpaid wages;

f.      Injunctive and declaratory relief;

g.      Reasonable costs and experts' and attorneys' fees; and

h.      Any other such relief that this Court deems just and proper to award.

## **JURY DEMAND**

Jones demands a jury for all issues proper to be so tried.

Respectfully submitted,

/s/ R. Scott Oswald
R. Scott Oswald, DC Bar # 458859
John T. Harrington, DC Bar # 987659
The Employment Law Group, P.C.
1717 K Street NW, Suite 1110
Washington, DC  20006
(202) 261-2830
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com
*Counsel for Robert A. Jones*