# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT A. JONES,

       Plaintiff,

    v.

OFFICE OF THE ARCHITECT OF THE
CAPITOL,

       Defendant.

Civil Action No. 21-0990 (CKK)

## MEMORANDUM OPINION
(March 19, 2025)

Plaintiff Robert A. Jones filed this suit to challenge the nonrenewal of his employment as a plumber in the Office of the Architect of the Capitol ("AOC") in December 2020, soon after he tested positive for COVID-19. *See generally* Second Am. Compl. ("Compl."), ECF No. 11. Jones, who is Black, alleges that by ending his employment, the AOC discriminated him based on his race, wrongfully interfered with his right to take medical leave related to COVID-19, and unlawfully retaliated against him for taking that leave. Compl. ¶¶ 71–107.

Now pending before the Court is the AOC's [29] Motion for Summary Judgment, in which it denies Jones's allegations and contends that it ended his employment for a nondiscriminatory, nonretaliatory reason: it did not have enough plumbing work to renew the employment of all of its plumbers and Jones was not among the best-performing plumbers on its team. Def.'s Mem. in Support of Def.'s Mot. for Summary J. ("Def.'s Mem."), ECF No. 29 at 16–45, at 1. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **GRANT** the AOC's Motion.

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:
- Plaintiff Jones's Second Amended Complaint ("Compl."), ECF No. 11;

# I. BACKGROUND

The following facts are supportable by admissible evidence and not genuinely disputed. *See* Fed. R. Civ. P. 56(c).

## A.  The AOC Construction Division

Jones worked as a plumber in the AOC Construction Division from 2003 until December 9, 2020.  Statement of Undisputed Material Facts ("SUMF"), ECF No. 30-1 at 2–6, ¶¶ 3, 13.

Most of the AOC Construction Division workforce consists of non-permanent employees who receive appointments for fixed terms.  *Id.* ¶ 5.  The Division employs plumbers like Jones for thirteen-month terms.  *Id.* ¶¶ 5–6, 13.  Between Jones's first appointment in 2003 and December 2020, the Division renewed his employment for consecutive thirteen-month terms.  *Id.* ¶¶ 13, 16.

The AOC refers to the last day of a temporary employee's term as the "not-to-exceed" or "NTE" date.  *Id.* ¶ 10.  When the Division renews a temporary employee's employment, the employee signs a form acknowledging that the employment is being extended for another limited period.  *Id.* ¶¶ 11.  Jones signed one such form in November 2019, affirming that his appointment was "strictly a temporary appointment where there is no permanent need or funding available for the work involved" and that the appointment was "limited in duration."  ECF No. 29-1 at 368.

---

- Defendant AOC's Motion for Summary Judgment ("Motion" or "Def.'s Mot."), ECF No. 29;
- Plaintiff Jones's Opposition to Defendant AOC's Motion ("Opposition" or "Pl.'s Opp'n"), ECF No. 30; and
- Defendant AOC's Reply in Support of its Motion ("Reply" or "Def.'s Reply"), ECF No. 35.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court.  *See* LCvR 7(f).

The AOC has a personnel policy, AOC Order 316-1, that requires 10 workdays' notice before termination of a temporary employee's employment based on lack of work, lack of funds, or failure to meet management expectations.  *See* Pl.'s Ex. 26, ECF No. 30-28.  The AOC interprets this policy to apply only to separations before the end of an employee's term, and its practice is not to not give advance notice of separations that occur on an employee's "not-to-exceed" date.[2]  *See* Def.'s Ex. F ("Bailey Decl."), ECF No. 29-1 at 422–30, ¶¶ 4–5; Def.'s Ex. G ("Johnson Dep."), ECF No. 29-1 at 431–57, at 34:2–36:22; Def.'s Ex. M ("Anderson Decl."), ECF No. 35-2 at 2–14, ¶¶ 3–4.

---

[2]     Jones argues that there is a genuine dispute about whether AOC Order 316-1 requires advance notice for terminations that occur on the employee's "not-to-exceed" date.  *See* Pl.'s Statement of Additional Undisputed Material Facts ("PSUMF"), ECF No. 30-1 at 7–11, ¶ 68 (disputed); Def.'s Reply to Pl.'s Statement of Material Facts in Dispute and Statement of Additional Undisputed Material Facts ("Def.'s Reply to PSMFD & PSUMF"), ECF No 35-1, at 5.  Jones argues that the policy applies to all separations, including those that occur on an employee's "not-to-exceed" date.  *See* PSUMF ¶¶ 67–68 (disputed); PSMFD ¶¶ 1–5.  The AOC's position is that the policy applies only to terminations that occur during an employee's scheduled term.  Def.'s Reply to PSMFD & PSUMF at 5.

   Notwithstanding the parties' disagreement about the proper interpretation of AOC Order 316-1, there is no genuine dispute about how the AOC in fact interprets and applies the policy:  In practice, the AOC does not give advance notice of separations that occur on a temporary employee's "not-to-exceed" date.  *See* Bailey Decl. ¶¶ 4–5; Anderson Decl. ¶¶ 3–4; *see also* Ross Decl. ¶ 5 (stating that Ross "did not receive any warning" prior to his non-renewal in 2021); Pl.'s Ex. 13 ("Mervin Jones Decl."), ECF No. 30-15, ¶¶ 4–5 (describing non-renewal in 2017 as "abrupt").  Jones has not identified any admissible evidence to the contrary.  *See* PSMFD ¶¶ 1–5.

   Jones cites Fuller's deposition testimony for the proposition that Order 316-1 "applies to" him, but Fuller's testimony on this topic does not reveal a genuine dispute about any material fact.  *See* PSUMF ¶ 68 (citing Fuller Dep. at 180:16–181:2).  Immediately before Fuller gave the testimony that Jones cites, Fuller was shown a copy of Order 316-1, which he testified was not familiar to him.  *See* Fuller Dep. at 178:2–181:11.  The following exchange ensued:

   Q:   So it says, subject, separation of nonpermanent temporary employees.   Was Mr. Jones a nonpermanent temporary employee?
   A:   Yes.
   Q:   So, would this document apply to Mr. Jones?
   A:   Yes, I would say so.

*Id.* at 180:17–181:2.  But neither this exchange nor any other part of Fuller's testimony shows that Fuller, Riley, or any other decision-maker at AOC understood Order 316-1 to require advance notice to temporary employees whose employment would not be renewed on their "not-to-exceed" dates.  *See* Fuller Dep. at 177:14–184:10.  On the contrary, Fuller testified that he had "never seen" the notice requirement in Order 316-1 before, and he thought it would be "not a good policy" to provide advance notice of non-renewals because "some people would fake an injury if they knew they were getting laid off."  *Id.* at 178:13–22.  Consistent with that view, Fuller testified that "[his] policy is" not to provide advance notice to anyone whose employment he suspects will not be renewed on an upcoming "not-to-exceed" date.  *Id.* at 177:14–178:1.

   Understood in this context, Fuller's testimony agreeing that the language of AOC Order 316-1 "applies to" Jones because Jones was a nonpermanent temporary employee is insufficient to create a genuine dispute about whether the AOC has a policy of giving temporary employees advance notice of separations that occur on an employee's "not-to-exceed" date.

Also in 2020, the AOC Construction Division assigned all its plumbers, including Jones, to work the night shift.  SUMF ¶ 18.  The night shift was a ten-hour shift from 7:00 p.m. until 5:30 a.m. the next morning.  *Id.*  Plumbers worked four days per week, starting work on Monday evening and ending their work weeks on Friday morning.  *Id.*  Jones testified that he never asked to be placed on the day shift.  *Id.* ¶ 61.

Starting in March 2020, the AOC implemented several policies in response to the COVID-19 pandemic.  *Id.* ¶ 29.  One of these policies allowed anyone with an underlying condition that placed them at elevated risk of serious illness from COVID-19 to apply for a special accommodation to be placed on administrative leave if they could not work remotely.  *Id.* ¶ 29.  Separately, from March 2020 until about July 6, 2020, the Division assigned staff to work alternating weeks to maintain social distancing.  *Id.* ¶ 31.  During weeks when staff were not working because of this policy, they were on paid administrative leave.  *Id.*

In the fall of 2020, James Fuller was the Division's Pipefitter General Supervisor, responsible for overseeing all the Division's plumbers.  *Id.* ¶ 6.  Fuller is Black.  *Id.* ¶ 14.  Two plumber supervisors reported to Fuller:  Kevin Ross, who is Black, and John Zibragos, who is White.  *Id.* ¶¶ 14–15.  Fuller reported to Ron Riley, the Division's Operations Manager.  *Id.* ¶ 15. And Riley reported to Chris Miles, the Acting Director of the Division.  *Id.* ¶ 15.

**B.  Events Preceding Jones's Termination**

In 2020, the Division occasionally assigned plumbers to work on non-plumbing tasks when there was not enough plumbing work available.  *Id.* ¶ 22.  During this time, Fuller sent frequent update emails to multiple AOC leaders, including Riley, in which he included the

message "Plumbers Need Work," in red text.[3]  *See* Def.'s Ex. I ("Fuller Decl.") Ex. 1 (emails), ECF No. 29-1 at 483–514.

Fuller sent an email to Riley in August 2020 that included a numbered list of plumbers in the AOC Construction Division.  Fuller Decl. ¶ 10 & Ex. 3, ECF No. 29-1 at 518.  The email carried the subject line "Plumbers" and began, "Ron, Here's your list."  *Id.* Ex. 3, ECF No. 29-1 at 518.  The numbered list included twelve names; Jones's name appeared as number nine.  *Id.* After the numbered list of names, the email closed with the following statements:

> Dean Pellegrini Admin working possibly with Richard Osborn[ ](drawings), Kyle Kibler the labor and Supervisor John Zibragos.  We need to talk about the end goal.  I have some concerns.

*Id.*  Fuller organized the list of names in this email "in the descending order of who [he] wanted to keep in case the [Construction Division] had to let some of the plumbers go due to lack of plumbing work."  Fuller Decl. ¶ 10.  Fuller also explained that he placed Jones "near the bottom of the list because although Mr. Jones could perform all plumbing tasks adequately, he did not excel in any particular skill and was lacking in steam work."  *Id.* ¶ 12.  Further, Fuller explained, "teamwork was important and other plumbers had told me that they had issues working with Mr. Jones."[4]  *Id.* ¶ 12.

---

[3]    Although Jones offers evidence to undercut the premise that that there was a shortage of work for AOC plumbers in 2020, *see* Pl.'s Ex. 44, ECF No. 30-46, he has not identified any admissible evidence that Riley and other AOC decision-makers did not receive or credit Fuller's emails expressing the opinion that there was such a shortage.  There is therefore no genuine dispute that Riley and other AOC decision-makers were advised of a shortage of work for AOC plumbers in 2020.

[4]    Jones disputes Fuller's characterization of his work performance and his relationships with colleagues, but he has not identified any admissible evidence to dispute Fuller's sworn statement about how he organized the list of plumbers.  *See* PSMFD ¶ 15–20.  Therefore, there is no genuine dispute that Fuller organized the list in descending order based on his preference about who he wanted to keep on his team if the AOC had to lay off plumbers due to a lack of work.

In November 2020, Fuller began repeating the "Plumbers Need Work" message multiple times in each of his update emails to AOC leaders.  *See, e.g.*, ECF No. 29-1 at 508, 510, 512, 514.

On or about November 19, Miles and Riley informed a senior AOC employee that the Construction Division was considering not renewing some plumbers' employment on their "not-to-exceed" dates because of a lack of plumbing work.  SUMF ¶¶ 15, 33.

On November 23, Jones used five hours of sick leave.  PSUMF ¶ 36 (undisputed); Def.'s Ex. C ("Johnson Decl.") Ex. 3 (timesheet summary), ECF No. 29-1 at 71; Pl.'s Ex. 3 (Fuller Dep.), ECF No. 30-5, at 156:19-157:2.  After using this sick leave, Jones's sick leave balance was exhausted.  Pl.'s Ex. 40 (email from Merideth Jones to Fuller), ECF No. 30-42.

On November 24, Miles and Riley informed the AOC's Chief Engineer that the Division was considering not renewing the employment of two specific plumbers:  Jones, who is Black, and Dean Pellegrini, who is White.  SUMF ¶¶ 14, 34–35.  At the time, Jones's "not-to-exceed" date was December 9, 2020, and Pellegrini's "not-to-exceed" date was December 23, 2020.  *Id.* ¶ 35.  The Division ultimately decided to renew Pellegrini's appointment because he was on light duty while receiving worker's compensation for a work injury.  *Id.* ¶ 36.  The Division preferred to keep Pellegrini on light duty rather than end his employment because it would be obligated to pay him worker's compensation even if it ended his employment.  *Id.*

Jones went to work on the night of November 24, but he and the other plumbers were allowed to leave early because of the upcoming Thanksgiving holiday on November 26.  SUMF ¶ 37.  Plumber Supervisor John Zibragos later confirmed by email that Jones and some other plumbers left work around midnight that night.  *Id.*; Fuller Decl. ¶ 13 & Ex. 4.  Jones used five hours of annual leave during this shift.  PSUMF ¶ 37 (undisputed).

Early on the morning of November 25, Fuller emailed two status reports to members of the Division's administrative staff. SUMF ¶¶ 38–39; Fuller Decl. Ex. 5. One of those reports indicated that on the night of November 24, Jones worked for five hours and took five hours' worth of annual leave. SUMF ¶ 38; Fuller Decl. Ex. 5. The other report indicated that on the night of November 25, Jones would be on annual leave for ten hours. SUMF ¶ 39; Fuller Decl. Ex. 5.

Later on the morning of November 25, Riley emailed Johnson and instructed her not to renew Robert Jones's employment beyond his NTE date on December 9, 2020. SUMF ¶ 40; Def.'s Ex. L. ("Riley Decl."), ECF No. 29-1 at 585–95, Ex. 2 (email from Riley to Johnson). There is no evidence in the record that Riley consulted with Fuller between November 23, when Jones first took off work due to illness and exhausted his sick leave balance, and November 25, when Riley sent this email. *See* Pl.'s Opp'n at 3 n.3.

The night shift on November 30 would have been Jones's first shift after the Thanksgiving holiday. SUMF ¶ 45. Soon after the shift started, Jones texted Fuller to ask for his email address. *Id.*; Def.'s Ex. K Ex. 2, ECF No. 29-1 at 579. Jones's wife then emailed Fuller a document showing that Jones had received a test for COVID-19 earlier that day and had been directed to quarantine pending the results of that test. SUMF ¶ 46. This email was the first notice Fuller received that Jones had sought medical care related to COVID-19. *Id.* ¶ 47. The Division placed Jones on paid COVID-19 administrative leave the same day. *Id.* ¶ 48.

On December 5, Jones texted Fuller that he had tested positive for COVID-19. *Id.* ¶ 49. Fuller replied, "I hope you feel better[;] can you give me paperwork." *Id.* Jones's wife later emailed Fuller medical documentation showing that Jones had tested positive for COVID-19 on December 4 and was required to isolate from others. *Id.* ¶ 51; PSUMF ¶ 38 (undisputed).

On December 9, Jones's "not-to-exceed" date, Riley and Fuller called Jones to tell him that the Division would not be renewing his employment; however, he did not answer, and the callers did not leave a message.  SUMF ¶ 53.  The same day, the Division sent Jones a letter informing him that his temporary appointment would expire on December 9 and would not be extended.  *Id.* ¶ 55.  The Division did not provide Jones with advance notice that his employment would not be renewed.  *See id.* ¶¶ 53, 55.

### C.  Other Events and Employment Actions

In addition to the events immediately surrounding Jones's termination, the parties' briefs discuss several other background facts about events and employment actions within the AOC that are not genuinely disputed.

*First*, when Jones began working for the AOC in 2003, the Construction Division's plumbing teams appeared to be grouped by race: nearly all Black plumbers worked the night shift under one supervisor, while nearly all White plumbers worked under a different supervisor. *See* Pl.'s Ex. 9 ("Ross Decl."), ECF No. 30-11, ¶ 15; Pl.'s Ex. 11 ("Pellegrini Decl."), ECF No. 30-13, ¶ 8; Pl.'s Ex. 12 ("Turner Decl."), ECF No. 30-14, ¶ 7; Pl.'s Ex. 8 ("Turner Dep."), ECF No. 30-10, at 20:8–21:11.  Sometime in or before 2016, Riley directed one of Fuller's predecessors, Mike Hotchkiss, to "reshuffle[]" plumbers between teams and shifts to resolve this "imbalance" between the teams of plumbers.  Pl.'s Ex. 2 ("Riley Dep."), ECF No. 30-4, at 67:13–71:16; *see* Fuller Decl. ¶ 2 (stating that Hotchkiss retired in 2016); Turner Decl. ¶ 6 (stating, in declaration dated May 2021, that the composition of teams began to change "five or six years ago").  Riley testified that he gave this direction to Hotchkiss to "correct the problem" and "correct the optics" of a racial imbalance between the teams.  Riley Dep. at 71:3–16.

*Second*, sometime in 2017, Jones took leave under the Family and Medical Leave Act ("FMLA") to care for his wife.  *See* Jones Dep. at 120:15–17.  Fuller was initially supportive of

8

Jones taking this leave, but Jones later came to feel that Fuller was requiring more documentation from him than was necessary under the circumstances. *Id.* at 120:15–123:11. Jones felt that these documentation requests were burdensome. *Id.* at 123:5–11 (describing "the harassment of the paper" and "the signing"). However, apart from the requests for documentation, Jones never suffered negative consequences for taking the FMLA leave that he needed. *See id.*

*Third*, in March 2017, the Division laid off thirty non-permanent employees, including four plumbers, due to a lack of work. SUMF ¶ 17. Three of the plumbers the Division laid off in March 2017 are White, and one is Black. *Id.*

*Fourth*, between April 2020 and the end of Jones's employment on December 9, 2020, the Division renewed the employment of three plumbers. PMSFD ¶ 14. Two of those plumbers are White, one is Black, and one is Latino. *Id.* During the same period, it ended the employment of one plumber, who is Black, citing lack of work and failure to meet management's expectations. SUMF ¶ 57; PSMFD ¶ 14. This plumber's employment ended in August 2020 after she had served a single thirteen-month term. SUMF ¶ 57.

*Fifth*, at least four plumbers were out of work on administrative leave related to COVID-19 in late 2020. SUMF ¶ 65. Three of those plumbers were still working at the Division at the time of the close of briefing in this case in January 2023, and one of them retired on May 31, 2021. *Id.*

*Sixth*, In March 2021, after the end of Jones's employment, the AOC did not renew the employment of Plumber Supervisor Kevin Ross, who is Black, after Ross declined to return to work following paid COVID-19 administrative leave. SUMF ¶¶ 14, 57.

*Seventh*, the AOC Construction Division did not hire any plumbers between the summer of 2019 and the close of briefing in this case.  SUMF ¶ 57.

## II. LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the

light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

Recognizing the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*). But the plaintiff is not relieved of the burden to support the relevant allegations with competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). On every issue on which the plaintiff would bear the burden of proof on a dispositive issue at trial, the plaintiff bears the burden of production at summary judgment to designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

## III. ANALYSIS

Jones alleges that AOC discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Congressional Accountability Act of 1995 ("CAA") ("Count One"); interfered with his right to take unpaid medical leave under the

Family and Medical Leave Act ("FMLA"), in violation of that Act ("Count Two"); unlawfully retaliated against him for exercising his FMLA rights, in violation of the same Act ("Count Three"); and unlawfully retaliated against him for taking leave to quarantine after taking a COVID-19 test and later receiving a positive test result, in violation of the Family First Coronavirus Response Act ("FFCRA") and Fair Labor Standards Act ("FLSA") ("Count Four"). Compl. ¶¶ 71–107. The AOC denies these allegations and says that it ended Jones's employment for a nondiscriminatory, nonretaliatory reason: it did not have enough plumbing work to renew the employment of all its plumbers, and Jones was not among the best-performing plumbers on its team. Def.'s Mem. in Support of Def.'s Mot. for Summary J. ("Def.'s Mem."), ECF No. 29 at 16–45, at 1.

For the reasons that follow, the Court concludes that Jones has not identified sufficient admissible evidence to allow a reasonable jury to find in his favor on any of his claims. The Court shall therefore **GRANT** the AOC's Motion for Summary Judgment.

### A. Count One: Race Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Congressional Accountability Act of 1995, 2 U.S.C. §§ 1301 *et seq.*, incorporates Title VII's substantive discrimination provisions and provides that they "shall apply . . . to the legislative branch of the Federal Government," including to the AOC and its employees. *See* 2 U.S.C. §§ 1301(a)(3)(F), 1302(a)(2).

A plaintiff can show a discriminatory employment practice in two ways. First, a plaintiff may proceed under a "'single-motive' or 'pretext' theory of discrimination." *Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007). When proceeding under a single-motive theory, "the plaintiff must show that a protected characteristic was a but-for cause of the adverse employment

action." *Savignac v. Day*, No. 19-cv-2443, __ F.3d. __, 2024 WL 4530225, at *19 n.8 (D.D.C. Oct. 3, 2024) (RDM) (citing *Fogg*, 492 F.3d at 451).  Second, a plaintiff may proceed under a "mixed-motive" theory, under which the plaintiff must show only "that unlawful discrimination was 'a factor motivating the adverse action.'" *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)).  The lighter burden of the mixed-motive theory comes at a cost: a plaintiff who prevails under only a mixed-motive theory cannot recover damages if the defendant proves, as a partial affirmative defense, that "would have taken the same action in the absence of the impermissible motivating factor."  42 U.S.C. § 2000e-5; *see Ponce*, 679 F.3d at 844–45.

A plaintiff need not decide between a single-motive and a mixed-motive theory when filing a complaint and "may ultimately decide to proceed under both theories of liability." *Ponce*, 679 F.3d at 845.  However, before a court will consider a mixed-motive theory on summary judgment, the plaintiff must "argue that race was a 'motivating factor'" in the challenged decision.  *Id.* (citing *Ginger*, 527 F.3d at 1345).  Here, neither Jones's Complaint nor his Opposition to the Motion for Summary Judgment uses the phrases "motivating factor" or "mixed motive."  *See* Compl., ECF No. 11, ¶ 76; Pl.'s Opp'n at 9–10, 18–20.  However, his Opposition frames the question before the Court as "whether there is a genuine issue of material fact as to whether AOC's termination decision was based *exclusively* on the expiration of Jones's contract and *unrelated to* his race or protected leave."  Pl.'s Opp'n at 20 (emphasis added). Elsewhere, he argues that "[a] reasonable jury . . . could determine [that the] AOC's reasons for terminating Jones *were pretext for* race discrimination and retaliation."  *Id.* at 18 (emphasis added).  Therefore, the Court understands Jones to be proceeding with both "single-factor" and a "motivating-factor" theories at this stage.

When evaluating claims of employment discrimination that are based on circumstantial evidence, courts apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Courts apply this framework in both single-motive and mixed-motive cases. *See Fogg*, 492 F.3d at 451 & n.*; *Ponce*, 679 F.3d at 844.

Under the *McDonnell Douglas* framework, "[t]he employee must first make out a *prima facie* case of . . . discrimination." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). "The employer must then come forward with a legitimate reason for the challenged action." *Id.* "If that burden is met, the district court must conduct one 'central inquiry' in deciding an employer's motion for summary judgment: 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Id.* (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008); *see also Brady v. Office of Sgt. at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008) (instructing that district courts "need not—*and should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*" once an employer has asserted a "legitimate, non-discriminatory reason for the decision" the employee challenges (emphasis in original)).

In resolving the "central question" at the third step of the *McDonnell Douglas* analysis, courts consider "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (internal quotation marks omitted).

14

Here, the AOC has met its initial burden of producing "admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions." *See Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019). According to the AOC, it ended Jones's employment because "there was a lack of work for plumbers" and James Fuller, who was responsible for supervising the plumbers, "did not consider [Jones] one of the top[-]performing plumbers." Defendant's Statement of Undisputed Material Facts ("DSUMF"), ECF No. 29 at 3–12, ¶ 56 (disputed). The AOC has proffered admissible evidence in support of this explanation, including evidence of the criteria that Fuller considered when making his judgment about Jones's performance relative to that of higher-ranked plumbers. *See, e.g.*, Riley Dep. at 124:16–126:5; Fuller Decl. ¶¶ 10–12 & Ex. 3 (email from Fuller to Riley).

Because the AOC has proffered a nondiscriminatory reason for its decision, the Court "need not . . . decide whether [Jones] actually made out a *prima facie* case" of discrimination. *Brady*, 520 F.3d at 494 (D.C. Cir. 2008). Instead, the summary judgment analysis turns on whether Jones's evidence is sufficient to allow a reasonable jury to conclude that the AOC's stated reason for ending his employment was a pretext for unlawful discrimination. *See Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015).

To withstand a motion for summary judgment in this posture, the plaintiff's evidence "must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1096. The issue is not "the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)). Accordingly, challenges that "weaken but

do not fully undermine the [employer's] proffered justification" are not necessarily sufficient to defeat a motion for summary judgment. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008).

When determining whether a plaintiff has carried this burden, "the court must consider all the evidence in its full context." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998). A plaintiff may show that an employer's stated reason is pretext by producing evidence of, among other things, "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff." *Walker*, 798 F.3d at 1092. "[I]ndependent evidence of discriminatory statements or attitudes on the part of the employer" may also be relevant. *Iyoha*, 927 F.3d at 566 (quoting *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 508 (D.C. Cir. 2005)).

Jones offers two kinds of evidence that he argues could lead a reasonable jury to disbelieve the AOC's stated reason for terminating him and conclude that its decision was instead based on racial discrimination. *See* Pl.'s Opp'n at 9–10, 18–19. First, he offers evidence that he argues might lead a reasonable jury to doubt that the AOC believed that it had a lack of work for plumbers and that Jones was not among its best performing plumbers. Second, he offers evidence from which a jury might conclude that Riley or other decision-makers at the AOC harbored discriminatory attitudes toward Black employees.

### 1.    Evidence Probative of Whether the AOC's Stated Reason Was True

First, Jones presents several arguments that he contends could lead a reasonable jury to disbelieve the AOC's stated reason for ending his employment. He disputes that a lack of work required the AOC to end some plumbers' employment in December 2020. Def.'s Opp'n at 18–

19.  He also contends that the AOC did not follow its own policy regarding the procedure for separating temporary employees from the Construction Division based on lack of work, lack of funds, or poor performance.  *Id.*  Finally, he notes that he received positive performance ratings throughout his tenure and had positive relationships with colleagues, and he argues that the AOC should have given him additional training if he lacked "specific skills [that] were becoming more prevalent in the work."  *Id.*

Jones's contention that the AOC did not, in fact, need to shrink the ranks of its plumbers due to lack of work is insufficient to allow a reasonable jury to conclude that this stated explanation was a pretext for discrimination.  Whether an employer is "making up or lying about the underlying facts that formed the predicate for the employment decision" may be relevant to the pretext inquiry, but "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence," the employee cannot defeat summary judgment merely by showing that the employer was mistaken about those facts.  *Brady*, 520 F.3d at 495.  Instead, the material issue "is whether *the employer honestly and reasonably believed*" that the underlying facts were true at the time of its decision.  *Id.* at 496 (emphasis in original); *see also George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").  Here, there is no genuine dispute that Fuller had been telling others for months that there was a shortage of work for plumbers.  *See* Fuller Decl. ¶ 6 & Ex. 1.  By November 2020, he was repeating the message multiple times in the same email.  *See, e.g.*, ECF No. 29-1 at 508.  Although Jones is correct that Fuller's emails showed that there was at least *some* work for plumbers, *see* Pl.'s Opp'n at 15–16, that fact does not discredit Fuller's assessment that there was not *enough* work for the number of plumbers working on the team.  Moreover, other facts support Fuller's assessment:  It is

undisputed that the AOC Construction Division was sometimes assigning plumbers to non-plumbing tasks in 2020 and that did not hire any new plumbers between the summer of 2019 and at least January 2023.   SUMF ¶¶ 22, 57.   Finally, Jones has not introduced any admissible evidence from which a jury could conclude that Fuller, Riley, or other decision-makers did not honestly believe that there was a shortage of work for plumbers.    On this record, it was reasonable for the AOC to conclude that it had more plumbers than it needed for the amount of work that was available in late 2020.  Jones's arguments about the availability of work therefore do not show that the AOC's stated reason for ending his employment was pretextual.

Jones's argument that the AOC did not follow one of its written policies is also unavailing as evidence of pretext.  Jones argues that AOC Order 316-1 requires advance notice whenever the AOC ends a temporary employee's employment due to lack of work, lack of funds, or failure to meet management's expectations, including when the AOC does so on an employee's "not-to-exceed" date. *See* PSUMF ¶¶ 66–68; PSMFD ¶¶ 1–5; *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (noting that an "unexplained inconsistency" with an employer's usual process "can justify an inference of discriminatory motive").   However, there is no genuine dispute that AOC does not, in practice, interpret and apply Order 316-1 to require advance notice for separation actions taken on the "not-to-exceed" date.  *See* Def.'s Reply to PSMFD & PSUMF at 5.   Jones has not introduced any evidence to the contrary; in fact, his evidence supports the conclusion that the AOC's consistent practice has been to inform employees of their non-renewal on or near their "not-to-exceed" dates.  *See* Ross Decl. ¶ 5 (stating that Ross "did not receive any warning" prior to his non-renewal in 2021); Pl.'s Ex. 13 ("Mervin Jones Decl."), ECF No. 30-15, ¶¶ 4–5 (describing non-renewal in 2017 as "abrupt").  Therefore, Jones has not shown that the AOC in fact deviated from its established practice.

Although reasonable minds may differ on the best interpretation of AOC Order 316-1's language, it is not this Court's role to interpret and enforce the AOC's internal policies. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978) ("Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it."). Because Jones has not shown that the AOC deviated from its actual practice regarding notice to employees terminated on their not-to-exceed dates, any variance between that established practice and the written language of AOC Order 316-1 is insufficient to allow a reasonable jury to infer that the AOC's stated reason for ending Jones's employment was a pretext for racial discrimination.

Finally, Jones's argument that his performance was good and that the AOC should have provided him additional training rather than end his employment is similarly unavailing. The AOC has not argued that Jones was a poor performer or that he would have been unable to achieve its expectations with additional training. Instead, its contention is that Fuller "did not consider [Jones] one of the top[-]performing plumbers." DSUMF ¶ 56 (disputed). Because that judgment is comparative, Jones could show that it is genuinely disputed only by introducing evidence that his performance was not only good, but also *better than* that of other plumbers who the AOC did retain. Because he has not introduced any such evidence, his argument based on his own performance or lack of training is unsuccessful.

### 2.    Evidence Probative of Discriminatory Attitudes

Next, Jones offers several kinds of evidence from which he argues a reasonable jury might draw the inference that Riley or other decision-makers at the AOC harbored discriminatory attitudes toward Black employees, which might in turn support a finding that the AOC's stated reason for ending his employment was a pretext for racial discrimination or that race was a factor in its decision. Jones first shows that the AOC ended his employment in

December 2020 while extending that of a White plumber, Dean Pellegrini, who it also considered for termination. *Id.* at 9–10. Next, he asserts that Riley and others at AOC had engaged in "long-running efforts to cause [him] to fail" preceding the end of his employment. *Id.* at 19. He also alleges that Riley and other AOC decision-makers engaged in prior acts of discrimination against Black employees, which he argues supports an inference that discrimination played a role in the AOC's decision to end his employment. *Id.* at 18–19.

The AOC's decision to retain Pellegrini over Jones does not show that its stated reason for ending Jones's employment was a pretext for discrimination because there are important dissimilarities between Jones and Pellegrini. The undisputed facts show that in December 2020, Pellegrini was on light duty and receiving workers' compensation, which the AOC would have been obligated to continue to pay even if it had ended his employment. SUMF ¶¶ 35–36. Therefore, retaining Pellegrini and terminating Jones saved more money than doing the opposite. *See id.* The AOC's decision to retain Pellegrini over Jones is therefore consistent with its stated reason for ending Jones's employment, which is that it lacked sufficient work and funds to pay all its plumbers. No reasonable jury could conclude based on Pellegrini's retention alone that the AOC's stated reason for ending Jones's employment was a pretext for discrimination.

Jones's assertion that Riley or others who participated in the decision to end his employment were involved in "setting [him] up to fail" is also unavailing as evidence of pretext because Jones has not produced admissible evidence to support the assertion. *See* Def.'s Opp'n at 6, 19. The only evidence that Jones cites in support of this contention is his own testimony about a conversation he had with Jason Majors. *See* PSUMF ¶¶ 20–22 (citing Jones Dep. at 116:11–117:23, 124:7–127:7, 217:23–218:11). Jones testified that sometime in mid-2017 or 2018, Majors gave Jones bad instructions on two projects. Jones Dep. at 123:12–126:16. On

one occasion, Majors told him to cut a "live" pipe in a library in the Dirksen Senate Office Building.[5]  *Id.* at 123:12–125:16.  On another occasion, Majors gave him inaccurate instructions about how to hang a sprinkler pipe, resulting in faulty work that later needed to be redone.  *Id.* at 125:19–126:5.   Jones testified that Majors later apologized to him for giving him these instructions.  *Id.* at 117:17–23.   According to Jones's testimony, Majors also told Jones that Riley had directed Majors to "put pressure on" Jones and create a pretext for firing him.  *Id.* at 117:17–23, 126:11–12.   However, because Majors's statement to Jones about the direction he received from Riley is an out-of-court statement being offered "to prove the truth of the matter asserted," it is hearsay.  *See* Fed. R. Evid. 801(c).  This statement is therefore inadmissible unless a hearsay exception applies.  Fed. R. Evid. 802.  Because Jones has not identified any relevant exception, he "would not be permitted to testify about the [statement] at trial," and his deposition testimony about it "counts for nothing" in the summary judgment analysis.  *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Without this statement, there is no admissible evidence in the record that Riley or anyone else who participated in the decision to end his employment participated in the alleged efforts to cause Jones to fail on specific projects.  *See Holcomb v. Powell*, 433 F.3d 889, 900 (D.C. Cir. 2006) (explaining that the discriminatory intent of individuals who did not participate in the challenged decision is not relevant in a Title VII case).  Therefore, Jones's allegations about these efforts are insufficient to permit a reasonable jury to conclude that the AOC's stated reason was a pretext for unlawful discrimination.

Finally, Jones's evidence that the AOC has sometimes treated Black employees less favorably than similarly situated White employees is insufficient to allow a reasonable jury to

---

[5]   A "live" pipe is one with water running through it; cutting such a pipe would cause serious, uncontrolled flooding.  *Id.* at 125:7–16.

conclude that the AOC's stated reason for terminating his employment was a pretext for racial discrimination. *See* Ross Decl. ¶¶ 16, 28–29; Turner Decl. ¶¶ 7–15; Davis Dep. at 59:15–60:4; Turner Dep. at 23:20–26:15, 39:1–14, 40:4–42:22, 67:19–68:14, 86:15–88:20, 97:1–100:17. Much of this evidence relates to events prior to 2016—several years before Jones's termination in December 2020—reducing its probative value as evidence of pretext. *See Hampton*, 685 F.3d at 1101 (concluding that remarks manifesting racial animus had little probative value when assessing an employer's motivation for actions taken "four and five years later"). Moreover, undisputed evidence shows that no later than 2016, Riley ordered corrective action to address one of the problems that Jones describes: a significant racial imbalance between teams of plumbers. Riley Dep. at 67:13–71:16; *see* Fuller Decl. ¶ 2 (stating that the recipient of this order retired in 2016); *see also* Turner Dep. ¶ 6 (stating in 2021 declaration that the composition of teams began to change "[a]pproximately five or six years ago"). Jones's other evidence consists of other employee's allegations and opinions about discriminatory conduct and attitudes at the AOC. *See, e.g.*, Davis Dep. at 65:1–15 (Safety Manager Davis's testimony that he would not want to work under Riley because Riley had failed to do anything about complaints of "racial problems" with AOC supervisors whose work Riley oversaw); Ross Decl. ¶ 29 (Plumber Supervisor Ross's statement that "[i]t appeared to [him] that Ron Riley had a group of white plumbers whose contracts would be renewed regardless of their performance"); Turner Decl. ¶ 15 (Plumber Edwin Turner's statement that"[b]ased on [his] personal experience and knowledge, white [AOC] employees were more likely to have their contracts renewed than African American employees"). This evidence is also unavailing, for two reasons. First, the record shows that some of the allegations and opinions on which Jones relies are based in part on events several years before his termination.[6] *See, e.g.*, Davis Dep. at 58:8–59:14, 65:8–66:1

---

[6] Because neither party has introduced deposition testimony from Ross, it is unclear when the events forming the

(Davis's testimony that his opinion about Riley was based in part on events that occurred in 2009 or 2010); Turner Dep. at 44:13–22 (Turner's testimony that his observations about White employees being more likely to have their contracts renewed was based in part on his experience "early on, when I got there"); *see also* Turner Dep. at 17:2–3 (Turner's testimony that he arrived at the AOC in 2007 or 2008). Second, the U.S. Court of Appeals for the D.C. Circuit has instructed that complaints of discrimination by employees other than the plaintiff may not be "used as a proxy to establish [a decision-maker's] discriminatory animus" in a Title VII case where, as here, "nothing more is known about the nature, merit, or outcome of those complaints." *Holcomb v. Powell*, 433 F.3d 889, 899–900 (D.C. Cir. 2006); *see also Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014) (same). Because Jones has not introduced concrete evidence of recent discriminatory conduct or statements by Riley or other AOC decision-makers, his evidence of other employee's perceptions of discrimination is insufficient to permit a reasonable jury to conclude that the AOC's stated reason for ending his employment was a pretext for racial discrimination.

*     *     *

In sum, because Jones has not identified sufficient admissible evidence in the record to allow a reasonable jury to find that the AOC's stated reason for ending his employment was a pretext for unlawful discrimination based on race or that race was a factor motivating its decision, the Court shall **GRANT** the AOC's motion for summary judgment as to Count One.

### B. Count Two: Interference with Protected Medical Leave

Jones next alleges that the AOC unlawfully interfered with his rights under the Family and Medical Leave Act ("FMLA"), in violation of 29 U.S.C. § 2615. *See* Compl. ¶¶ 79–88. "To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that

---

basis of Ross's opinion about Riley took place. *See* Ross Decl. ¶ 29.

reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020). When analyzing such a claim, courts consider whether the challenged conduct could cause "a reasonable employee" to be "discouraged from exercising FMLA rights." *Id.* at 1377.

The FMLA provides, as relevant here, an entitlement to "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of" the employee's position. 29 U.S.C. § 2612(a)(1)(D). A covered employee may also take FMLA leave "[i]n order to care for the [employee's] spouse . . . if [the employee's] spouse . . . has a serious health condition." *Id.* § 2612(a)(1)(D). The Act defines a "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). A non-permanent employee like Jones is entitled to leave under these provisions if the employee has been employed for at least 12 months and has worked at least 1,250 hours for the employer in the most recent 12-month period. *Id.* § 2611(2)(A).

Here, the evidence is insufficient to allow a reasonable jury to conclude that the AOC interfered with Jones's FMLA rights by ending his employment in December 2020.

It is undisputed that the AOC decided on November 25, 2020, that it would not renew Jones's employment past his "not-to-exceed" date of December 6, 2020. SUMF ¶ 40. Jones did not notify anyone at the AOC that he had sought medical care related to COVID-19 until November 30. *See id.* ¶¶ 46–48. And Jones has not introduced any evidence that he ever requested FMLA leave related to his COVID-19 diagnosis; instead, it is undisputed that the AOC

placed Jones on paid COVID-19 administrative leave the same day it received notice that he had

seen a medical provider for a test and was awaiting results. *Id.* ¶¶ 47–48.

Jones's interference argument therefore depends on the inference that the AOC could

have *predicted* on November 25 that he might later become eligible for FMLA leave and request

such leave. Drawing all inferences in Jones's favor, the AOC arguably could have made that

prediction as early as November 23, when Jones took five hours of sick leave. *See* PSMFD

¶¶ 22–23 (disputed); Johnson Decl. Ex. 3 (timesheet); *see also* Pl.'s Ex. 40 (email to Fuller dated

Nov. 30, describing Jones's use of sick leave on Nov. 23). Earlier in November, Jones had

expressed concern about exposure to people who had tested positive for COVID-19 to Fuller and

to Da'rrell Davis, a Safety Manager who performed contact tracing for the Division. *See*

PSUMF ¶¶ 27–29 (disputed); Pl.'s Ex. 5 ("Davis Dep."), ECF No. 30-7, at 29:3–36:13; Pls.' Ex.

3 ("Fuller Dep."), ECF No. 30-5, at 151:1–17; Pl.'s Ex. 16 (text message to Davis), ECF No. 30-

18; Pl.'s Ex. 17 (text message to Fuller), ECF No. 30-19; Def.'s Reply to PSMFD & PSUMF at

38–40. Jones had also expressed concern to Fuller that he was at increased risk of serious illness

from COVID-19 because he had a respiratory condition for which he used an inhaler. Fuller

Dep. at 151:1–155:15. A reasonable jury could infer from this evidence that once Jones took

sick leave on November 23, the AOC could have predicted that Jones would later test positive

for COVID-19 and might request FMLA leave in connection with that illness.

However, nothing in the FMLA requires an employer like the AOC to predict an

employee's potential *future* request for protected leave and refrain from taking adverse action

against the employee for unrelated reasons in the meantime. Although an employer must not

interfere with an employee's protected statutory rights, "the FMLA does not 'protect an

employee's job against a legitimate, unrelated, reason for separation.'" *Thomas v. District of*

*Columbia*, 227 F. Supp. 3d 88, 110 (D.D.C. 2016) (RDM) (quoting *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 155 (D.D.C. 2012) (RMC)); *see also Hopkins*, 851 F. Supp. 2d at 155 (collecting cases), *aff'd sub nom. Hopkins v. Grant Thornton, LLP*, 529 F. App'x 1 (D.C. Cir. 2013).  And as discussed at length above, the AOC has proffered a legitimate reason for ending Jones's employment that is unrelated to his need to take leave—covered by FMLA or otherwise—in November and December 2020: it did not have enough work for all of its plumbers, and Jones was not among the top-performing members of its team.  *See supra* Section III.A; DSUMF ¶ 56 (disputed); Riley Dep. at 124:16–126:5; Fuller Decl. Ex. 3 (email from Fuller to Riley), ECF No. 29-1 at 518.

The question, then, is whether Jones has introduced sufficient evidence to allow a reasonable jury to conclude that the AOC ended his employment not for the reason it has offered, but instead because he might soon request FMLA leave.  *See Thomas*, 227 F. Supp. 3d at 111. Jones has not introduced any evidence from which a reasonable jury could draw this conclusion.

Therefore, no reasonable jury could find from the evidence in the record that the AOC interfered with Jones's exercise of FMLA rights by ending his employment in December 2020. Accordingly, the Court shall **GRANT** the AOC's motion for summary judgment as to Count Two.

### C.  Count Three: FMLA Retaliation

Jones next alleges that the AOC unlawfully retaliated against him for exercising his rights under the FMLA.  *See* Compl., ¶¶ 89–100.  Courts in this Circuit "evaluate FMLA retaliation claims under the *McDonnell Douglas* framework."  *Waggel*, 957 F.3d at 1376.  "To establish a *prima facie* case of FMLA retaliation, a plaintiff must show (1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action."  *Id.*  An employer may rebut a *prima facie* case of retaliation by

26

providing "evidence of a legitimate, nonretaliatory reason for the adverse action." *Id.* If the employer produces such evidence, the burden shifts back to the plaintiff to "identify evidence of pretext in order to overcome the employer's rebuttal and survive summary judgment." *Id.* at 1375–76.

Because the AOC has proffered a nonretaliatory reason for deciding not to renew Jones's employment in December 2020 and offered admissible evidence in support of its explanation, the question is whether Jones's evidence is sufficient to allow a jury to find that the AOC's stated reason is a pretext for unlawful retaliation for the exercise of his FMLA rights. *See* DSUMF ¶ 56 (disputed); Riley Dep. at 124:16–126:5; Fuller Decl. Ex. 3 (email from Fuller to Riley), ECF No. 29-1 at 518.

The evidence in the record is insufficient to allow a reasonable jury to find that the AOC's decision to end Jones's employment was retaliation for his exercise of FMLA rights in November or December 2020.

*First*, Jones has not shown that he engaged in any protected FMLA activity in November or December 2020 or that he was entitled to do so. Because FMLA leave is available only in connection with a "serious health condition" requiring "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider," the fact that Jones tested positive for COVID-19 is not, by itself, sufficient to show that he was entitled to FMLA leave. *See* 29 U.S.C. §§ 2611(11), 2612(a)(1). Instead, to avoid summary judgment, Jones must identify evidence from which a reasonable jury could conclude that his case of COVID-19 was a "serious health condition" requiring "inpatient care" or "continuing treatment by a health care provider." *See id.*; *see also Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 65 (D.D.C. 2011) (RMU). "[C]onclusory statements" that a condition is serious, "without more,

are insufficient to defeat a motion for summary judgment." *Deloatch*, 797 F. Supp. 2d at 65. Although there can be no doubt that COVID-19 is "serious" in the ordinary sense of the word or that it can develop into a "serious health condition" within the meaning of the FMLA in some cases, the evidence in the record is insufficient to allow a reasonable jury to conclude that Jones's course of COVID-19 was a qualifying condition under the FMLA.  *See* Jones Dep. at 151:31–152:10 (explaining that Jones did not go to the hospital, but instead recovered at home under the care of his wife).

*Second*, the timing of Jones's termination makes it implausible that the AOC ended his employment because it expected that he would request FMLA leave.  It is undisputed that the AOC decided to end Jones's employment on November 25.  SUMF ¶ 40.   It is also undisputed that Jones did not notify anyone at the AOC that he had sought medical attention related to COVID-19 until five days later, on November 30.  *See* SUMF ¶¶ 45–47; Def.'s Ex. K Ex. 2, ECF No. 29-1 at 579.  Accordingly, no reasonable jury could conclude that there was a causal link between the AOC's decision to end Jones's employment and his potential need for FMLA leave in November and December 2020.

The evidence in the record is also insufficient to allow a reasonable jury to find that the AOC's decision to end Jones's employment in December 2020 was retaliation for the FMLA leave that he took to care for his wife in 2017.  The passage of several years between the exercise of protected rights and the allegedly retaliatory action weighs heavily against this claim.  *See Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (noting that the D.C. Circuit has generally analyzed evidence of temporal proximity in retaliation cases "in terms of months—not years"); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing with approval decisions finding no *prima facie* evidence of retaliation after three- and four-month gaps and concluding

that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all"). And Jones has not proffered any admissible evidence to explain why the AOC would have renewed his employment several times between 2017 and 2020 if its decision to end his employment in 2020 was based on a motive to retaliate for the leave he took in 2017.

To the extent that Jones attempts to ground his FMLA retaliation claim on other actions the AOC took in connection with the leave he took in 2017, those efforts are unsuccessful. The only admissible evidence that Jones cites regarding his 2017 FMLA leave is his own deposition testimony, in which he describes a conversation in which Fuller asked him to provide the name and phone number of a medical provider, apparently in response to a request from someone else at the AOC for more documentation. *See* PSUMF ¶ 18 (disputed) (citing Jones Dep. at 120:15– 121:11, 121:24–123:11). Jones testified that apart from these requests for documentation, he suffered no negative consequences for taking FMLA leave in 2017. Jones Dep. at 123:5–11. Because the FMLA expressly authorizes employers to require medical documentation before approving FMLA leave, it would be incongruous to hold that requests for documentation alone are sufficient to show retaliation. *See* 29 U.S.C. § 2613(a) ("An employer may require that a request for leave . . . be supported by a certification issued by the health care provider. . . ."); *see also Hodges v. District of Columbia.*, 172 F. Supp. 3d 271, 281 (D.D.C. 2016) (TSC) ("FMLA leave may be denied absent an appropriate certification [or] . . . if a medical certification does not support an employee's entitlement to such leave."). Therefore, Jones's other evidence related to his 2017 FMLA leave is insufficient to support a retaliation claim.

As the Court has already explained, there are other important weaknesses in Jones's proffered evidence that the AOC's stated reason for ending his employment was pretextual. *See supra* Section III.A.1. His Title VII discrimination claim presents a close issue on summary

judgment because he has produced evidence that a reasonable jury could find is probative of a pattern of discrimination against Black employees at the AOC. *Id.* By contrast, he has introduced no such evidence of a pattern of retaliation against employees for exercising FMLA rights. In the absence of such evidence, no reasonable jury could find that the AOC's stated reason for ending his employment was a pretext for unlawful retaliation for protected FMLA activity.

Because no reasonable jury could find from the evidence in the record that the AOC's stated reason for ending Jones's employment was a pretext for unlawful retaliation for the exercise of FMLA rights in either 2017 or 2020, the Court shall **GRANT** the AOC's motion for summary judgment as to Count Three.

### D. Count Four: FFCRA Retaliation

Finally, Jones alleges that the AOC unlawfully retaliated against him for exercising his statutory right to take leave related to COVID-19. Compl. ¶¶ 101–07. The Family First Coronavirus Response Act ("FFCRA"), Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020), contains the Emergency Paid Sick Leave Act ("EPSLA"), a temporary amendment to the FMLA that made it unlawful "for any employer to discharge, discipline, or in any other manner discriminate against any employee who," among other things, took leave because "[t]he employee [was] experiencing symptoms of COVID–19 and seeking a medical diagnosis" or "ha[d] been advised by a health care provider to self-quarantine due to concerns related to COVID–19." *See* Pub L. No. 116-127 §§ 5101, 5104, 134 Stat. 178, 196–97. EPSLA further provided that "[a]n employer who willfully violate[d]" this provision "shall . . . be considered to be in violation of section 15(a)(3) of the Fair Labor Standards Act of 1938 (29 U.S.C. 215(a)(3))." *Id.* § 5105(b)(1), 134 Stat. 178, 197. The EPSLA expired on December 31, 2020. *Id.* § 5109, 134 Stat. 178, 198.

Because the EPSLA's enforcement provisions the Fair Labor Standards Act ("FLSA"), federal courts have consistently applied the FLSA framework to EPSLA retaliation claims. *See, e.g.*, *Burgen v. Pine Enterprises LLC*, No. 22-13519, 2023 WL 6486476, at *2 (11th Cir. Oct. 5, 2023); *Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *4 (6th Cir. June 1, 2023); *Wilson v. Marshall Shredding LLC,* 616 F. Supp. 3d 633, 640 (W.D. Tex. 2022), *aff'd*, No. 22-50709, 2023 WL 3151078 (5th Cir. Apr. 28, 2023); *Wadley v. Nat'l Ry. Equip. Co.*, 572 F. Supp. 3d 361, 370 (W.D. Ky. 2021). And courts in this Circuit have used the *McDonnell Douglas* framework to evaluate FLSA retaliation claims that are based on circumstantial evidence. *See, e.g.*, *Sparrow v. Washington Metro. Area Transit Auth.*, No. 22-cv-2216, 2024 WL 3551962, at *11 (D.D.C. July 26, 2024) (JDB); *Guerrero v. Vilsack*, 134 F. Supp. 3d 411, 428 (D.D.C. 2015) (RMC); *Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 55 (D.D.C. 2015) (RC).

Accordingly, this Court will analyze Jones's FFCRA retaliation claim using the same *McDonnell Douglas* framework applied above to Jones's Title VII and FMLA claims. Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination or retaliation. *See Iyoha*, 927 F.3d at 566. If the plaintiff carries that burden, the burden shifts to the employer to proffer evidence of a nondiscriminatory, nonretaliatory reason for the challenged action. *Id.* If the employer produces such evidence, the burden shifts back to the plaintiff to produce evidence from which a reasonable jury could conclude that the employer's reason was a pretext for unlawful discrimination or retaliation. *Id.*

Here again, because the AOC has identified a nonretaliatory reason for ending Jones's employment, the analysis focuses on the final step, and the court must decide whether Jones has

identified sufficient evidence to allow a reasonable jury to find that the AOC's stated reason is pretext for unlawful retaliation.

Jones's best evidence in support of his FFCRA retaliation claim is the fact that the AOC ended his employment soon after he tested positive for COVID-19 and began to take paid leave due to his diagnosis, but this evidence alone is insufficient to support his claim. "The temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation." *Walker*, 798 F.3d at 1092. But "dislodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires 'positive evidence beyond mere proximity.'" *Waggel*, 957 F.3d at 1376 (quoting *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015)).

Jones's FFCRA retaliation claim ultimately fails for the same reasons as his FMLA retaliation claim: First, the timing of Jones's termination makes it implausible that the AOC ended his employment because of his need to take protected leave: the AOC decided to end Jones's employment on November 25, and he did not notify anyone at the AOC that he had sought medical attention related to COVID-19 until November 30. *See* SUMF ¶¶ 40, 45–47; Def.'s Ex. K Ex. 2, ECF No. 29-1 at 579. Second, Jones has not shown any pattern of retaliation against employees who exercised their statutory rights that would allow a reasonable jury to find that the AOC's stated reason for ending his employment was a pretext for unlawful retaliation. On the contrary, his own evidence shows that the AOC often placed employees on paid COVID-19 administrative leave and later allowed them to return to work without penalty. *See, e.g.*, Davis Decl. ¶¶ 6–7; Turner Decl. ¶ 19. In the absence of evidence of a pattern of retaliation or discriminatory attitudes regarding medical leave, Jones's other evidence is insufficient to allow a

reasonable jury to conclude that the AOC's stated reason for ending his employment was a pretext for unlawful retaliation.

Because no reasonable jury could find from the evidence in the record that the AOC's stated reason for ending Jones's employment was a pretext for unlawful retaliation for the exercise of his FFCRA rights, the Court shall **GRANT** the AOC's motion for summary judgment as to Count Four.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** the Defendant's [29] Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.


**Dated:** March 19, 2025

COLLEEN KOLLAR-KOTELLY
United States District Judge